**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 21-cv-23303-COOKE/REID**

**Honorable Lisette M. Reid, United States Magistrate Judge for the Southern District of Florida**

**Order of Reference Date:  March 3, 2022**

JERALD VARGAS MALESPIN,
individually and on behalf of all others
similarly situated,

Plaintiff,

vs.

LONGEVERON INC., GEOFF GREEN,
JAMES CLAVIJO, JOSHUA M. HARE,
DONALD M. SOFFER, NEIL E. HARE,
ROCK SOFFER, EF HUTTON F/K/A
KINGSWOOD CAPITAL MARKETS,
and ALEXANDER CAPITAL
L.P.

Defendants.
_____/

## AMENDED COMPLAINT

        Lead Plaintiff John Bosico ("Plaintiff"), individually and on behalf of all other persons

similarly situated, by his undersigned attorneys, for his amended complaint against Defendants

(defined below), allege the following based upon personal knowledge as to himself and his own

acts, and upon information and belief as to all other matters based on the investigation conducted

by and through his attorneys, which included, among other things, a review and analysis of: (i)

Defendants' public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) public

reports and news articles; (iii) transcripts of Defendants' conference calls; (iv) interviews with

confidential witnesses with relevant information; and (v) other publicly-available material and data identified herein. Plaintiff's investigation is continuing, and many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control or custody. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all persons and entities other than Defendants that purchased or otherwise acquired: (a) Longeveron Class A common stock pursuant and/or traceable to the Offering Documents (defined below) issued in connection with the Company's initial public offering conducted on or about February 12, 2021 (the "IPO" or "Offering"); and/or (b) Longeveron common stock between February 12, 2021 and August 12, 2021, both dates inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2. Defendant Longeveron is a clinical stage biotechnology company that develops cellular therapies for aging-related and life-threatening conditions.

3. On January 19, 2021, Longeveron filed a registration statement on Form S-1 with the SEC in connection with its initial public offering, which, after several amendments, was declared effective by the SEC on February 11, 2021 (the "Registration Statement").

4. On or about February 12, 2021, pursuant to the Registration Statement, Longeveron's Class A common stock began trading on the Nasdaq Capital Market ("NASDAQ") under the ticker symbol "LGVN."

5.      Also on February 12, 2021, Longeveron filed a prospectus on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement (the "Prospectus" and, together with the Registration Statement, the "Offering Documents").

6.      Pursuant to the Offering Documents, Longeveron conducted the IPO, issuing 2.66 million shares of its Class A common stock to the public at the Offering price of $10.00 per share, for approximate proceeds of $24.7 million to the Company after applicable underwriting discounts and commissions, and before expenses.

7.      Longeveron is a development stage biotechnology company with no FDA approved products. The company's primary focus is on developing Lomecel-B, a cell-based therapy product sourced from the bone marrow of young healthy adult donors. Longeveron has initiated six clinical studies under U.S. Food and Drug Administration ("FDA") Investigational New Drug applications since 2014 to evaluate the efficacy and safety of Lomecel-B.

8.      One of the functions Longeveron investigated was Lomecel-B's efficacy in treating Aging Frailty. According to Defendants, "[a]ging Frailty is a common geriatric condition that disproportionately increases a patient's risk for poor clinical outcomes due to disease and injury, and is widely believed by geriatricians to ultimately be treatable." In testing Lomecel-B's efficacy in treating Aging Frailty, Longeveron conducted two U.S. clinical trials, a Japanese trial, and a Bahamas trial. Defendants said Lomecel-B "has the potential to reduce inflammation associated with Aging Frailty, and to promote an anti-inflammatory state by releasing anti-inflammatory molecules, which can promote physiological restoration to a more normal state."

9.      In 2017, the Bahamian government granted Longeveron approval to sponsor a Registry Trial in Nassau, the Bahamas. Eligible subjects with aging frailty who met Registry eligibility requirements could receive Lomecel-B at their own expense. The participants are

required to follow up with their local physicians at specified time points over 12 months, so that Longeveron can "collect safety data and gain additional efficacy information, specifically with respect to physical function, the individual's global impressions of change, biomarkers, and other indication-specific measures."

10.     In addition to the registry trial, Longeveron conducted a Phase 2b trial of its Lomecel-B product for Aging Frailty (the "Phase 2b Trial"). This trial was crucial to obtaining FDA approval. The Phase 2b Trial concluded enrollment on or about February 12, 2020. At the time, the Phase 2b Trial was Longeveron's "most advanced clinical trial in our Aging Frailty program." The Phase 2b Trial's primary efficacy endpoint was the six-minute walk test ("6MWT"), a 6-minute cardiological walking test. In addition to the 6MWT, the Offering Documents stated Longeveron would collect additional data measuring Aging Frailty, including: "physical functioning biomarkers; patient-reported outcomes (PROs); quality-of-life measures (QOLs); frailty status; and clinical outcomes and other endpoints applicable to Aging Frailty." The Phase 2b Trial was designed with input from the FDA. Longeveron included "patient reported outcomes" or "PROs" as an additional endpoint under advisement from the FDA.

11.     In the IPO and thereafter, Longeveron touted the tremendous potential of Lomecel-B and the Phase 2b Trial. Yet, a confidential witness revealed that the Bahamas Registry Trial results indicated middling patient reports in response to taking Lomecel-B. As a result, Lomecel-B was unlikely to meet Longeveron's self-adopted standard for efficacy in treating aging frailty, and Defendants' bullish statements were misleading for failing to disclose this fact.

12.     The truth came to light when, on August 13, 2021, Longeveron issued two press releases—one announcing topline results of the Phase 2b Aging Frailty Trial, and a second providing a corporate update and reporting the Company's financial results for the second quarter

of 2021. Both press releases disclosed, among other results, that "the four Lomecel-B cohorts did not show a statistically significant placebo-adjusted difference" and that "in the patient reported outcome questionnaire PROMIS—Physical Function—Short Form 20a (SF-20a) total score [. . .] Lomecel-B cohorts did not show a statistically significant difference compared to the placebo cohort[.]"

13.     On this news, Longeveron's stock price fell $1.51 per share, or 27.91%, to close at $3.90 per share on August 13, 2021, representing a total decline of 61% from the Offering price.

14.     At the time the initial complaint was filed, Longeveron shares were trading at $3.68 per share, far below the IPO price of $10 per share.

15.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Longeveron's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. §78aa).

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)) because Longeveron's principal executive offices is located in this district.

19.     In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

20.     Lead plaintiff John Bosico purchased Longeveron shares pursuant and/or traceable to the Registration Statement at artificially inflated prices during the Class Period and suffered damages. His PSLRA certification has been previously filed with the Court and is incorporated by reference herein.

21.     Defendant Longeveron is a Delaware corporation with principal executive offices located at 1951 NW 7th Avenue, Suite 520, Miami, Florida 33136. The Company's Class A common stock trades in an efficient market on the NASDAQ under the ticker symbol "LGVN."

22.     Defendant Joshua M. Hare ("J. Hare") served as a Manager of Longeveron at the time of the IPO and is currently Chairman of the Company's Board of Directors (the "Board"). J. Hare is also a co-founder of the Company. J. Hare signed or authorized the signing of the Registration Statement filed with the SEC. J. Hare is a double board-certified cardiologist (Cardiology and Advanced Heart Failure and Transplantation) and the founding director of the Interdisciplinary Stem Cell Institute at the University of Miami's Miller School of Medicine. J. Hare received a B.A. from the University of Pennsylvania, and an M.D. from The Johns Hopkins University School of Medicine. Defendant J. Hare is the brother of Defendant Neil E. Hare.

23.     Defendant Geoff Green ("Green") has served as Longeveron's Chief Executive Officer at all relevant times. Green signed or authorized the signing of the Registration Statement filed with the SEC. Green has held a variety of leadership roles throughout his time in the life

sciences and drug development industry. Green received a B.A. in biology from Kenyon College, and an M.B.A. from Barry University's Andreas School of Business.

24. Defendant James Clavijo ("Clavijo") has served as Longeveron's Chief Financial Officer at all relevant times. Clavijo signed or authorized the signing of the Registration Statement filed with the SEC. Clavijo has over 25 years of experience in executive, finance and accounting activities, including experience as a Chief Financial Officer for several pharmaceutical, healthcare, medical device and manufacturing companies. Clavijo received a B.A. in Chemistry (PreMed) from the University of Florida, a B.A. in Accounting from the University of Nebraska, and a Masters in Accounting from Florida International University.

25. Defendants J. Hare, Green and Clavijo are the "Exchange Act Individual Defendants."

26. Defendant Longeveron and the Exchange Act Individual Defendants are the "Exchange Act Defendants."

27. Defendant Donald M. Soffer ("D. Soffer") served as a Manager of Longeveron at the time of the IPO and is currently on the Board. D. Soffer is also a co-founder of the Company. D. Soffer signed or authorized the signing of the Registration Statement filed with the SEC. D. Soffer is a businessman and real estate developer in Florida. D. Soffer founded Turnberry Associates Inc. in 1977. Defendant D. Soffer is the father of Defendant Rock Soffer.

28. Defendant Neil E. Hare ("N. Hare") served as a Manager of Longeveron at the time of the IPO and is currently on the Board. N. Hare signed or authorized the signing of the Registration Statement filed with the SEC. N. Hare received a J.D. from American University's Washington College of Law and a B.A. in international relations from Tufts University. Defendant N. Hare is the brother of Defendant J. Hare.

29.     Defendant Rock Soffer ("R. Soffer") served as a Manager of Longeveron at the time of the IPO. R. Soffer signed or authorized the signing of the Registration Statement filed with the SEC. R. Soffer is President, Special Project Division at Turnberry Associates. Defendant R. Soffer is the son of Defendant D. Soffer.

30.     The Exchange Act Individual Defendants and Defendants D. Soffer, N. Hare, and R. Soffer are sometimes referred to herein collectively as the "Securities Act Individual Defendants."

31.     As directors, executive officers and/or major shareholders of the Company, the Securities Act Individual Defendants participated in the solicitation and sale of Longeveron common stock in the IPO for their own benefit and the benefit of Longeveron. The Securities Act Individual Defendants were key members of the IPO working group and executives of Longeveron who pitched investors to purchase the shares sold in the IPO.

32.     Longeveron and the Securities Act Individual Defendants are sometimes referred to herein collectively as the "Securities Act Defendants."

33.     Each of the Exchange Act Individual Defendants:

    a.      directly participated in the management of the Company;

    b.      was directly involved in the day-to-day operations of the Company at the highest levels;

    c.      was privy to confidential proprietary information concerning the Company and its business and operations;

    d.      was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e.      was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

f.      was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

g.      approved or ratified these statements in violation of the federal securities laws.

34.     Defendant EF Hutton f/k/a Kingswood Capital Markets ("EF Hutton") is a financial services company headquartered in New York, New York. EF Hutton served as the underwriter representative for the IPO, helping to draft and disseminate the Registration Statement and to solicit investors to purchase Longeveron common stock issued pursuant thereto.

35.     Defendant Alexander Capital L.P. ("Alexander Capital") is a financial services company located in New York, New York. Alexander Capital served as an underwriter for the IPO, helping to draft and disseminate the Registration Statement and to solicit investors to purchase Longeveron common stock issued pursuant thereto.

36.     Defendants EF Hutton and Alexander Capital are referred to herein as the "Underwriter Defendants."

37.     The Exchange Act Defendants, the Securities Act Defendants, and the Underwriter Defendants are sometimes collectively, in whole or in part, referred to herein as the "Defendants."

38.     The Defendants each reviewed, signed and/or approved the Registration Statement.

39.     The Underwriter Defendants agreed to purchase and to sell shares of Longeveron common stock to the public as follows:

| Underwriter | Number of Shares |
|---|---|
| Kingswood Capital Markets, division of Benchmark Investments, Inc. | 1,330,000 |
| Alexander Capital L.P. | 1,330,000 |
| Total: | 2,660,000 |

40.    The Underwriter Defendants collectively received over $1.8 million in underwriting discounts and fees for underwriting the IPO.

## SUBSTANTIVE ALLEGATIONS

### Longeveron and the IPO

41.    Founded in 2014, Longeveron is a clinical stage biotechnology company that develops cellular therapies for aging-related and life-threatening conditions. The Company's lead investigational product is Lomecel-B, formerly known as Longeveron Allogeneic Mesenchymal Stem Cells ("LMSCs"), a cell-based therapy product that is derived from the bone marrow of young healthy adult donors. According to the Prospectus filed February 12, 2021, Defendants were researching various applications of Lomecel-B, including its ability to "treat multiple facets of aging-related disorders simultaneously through multiple mechanisms of actions."

42.    On January 19, 2021, Longeveron filed the Registration Statement on Form S-1 with the SEC in connection with the IPO, which, after several amendments, was declared effective by the SEC on February 11, 2021.

43.    On or about February 12, 2021, pursuant to the Registration Statement, Longeveron's Class A common stock began trading on the NASDAQ under the ticker symbol "LGVN." That same day, Longeveron filed the Prospectus on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement.

44.    Pursuant to the Offering Documents, Longeveron conducted the IPO, issuing 2.66 million shares of its Class A common stock to the public at the Offering price of $10.00 per share, for approximate proceeds of $24.7 million to the Company after applicable underwriting discounts and commissions, and before expenses.

### Lomecel-B

10

45.     Lomecel-B, formerly known as LMSC, is a cell-based therapy product derived from the bone marrow of healthy adult donors aged 18 to 45. The Offering Documents describe Lomecel-B, stating the "proposed mechanisms of action of Lomecel-B derive from intrinsic cellular features[.] Lomecel-B cells secrete numerous proteins [. . .] which are believed to be responsible for decreasing inflammation and promoting repair."

46.     In 2017, Longeveron announced the publication of Phase 1 safety, tolerability, and efficacy data of Lomecel-B (then known as LMSC or MSC) in patients with Aging Frailty. The study was co-authored by, among other authors, Defendants J. Hare and Green. The announcement stated "MSC treatment in this patient population is safe" and that "the treatment has led to improvements in functional and immunologic status." However, the study was limited by its small sample size and a lack of blinded, randomized design. As the study noted, further studies "with larger sample sizes and blinded, randomized study designs" were underway to "confirm or refute the provocative efficacy results."

47.     Also in 2017, The Journals of Gerontology published a study co-authored by J. Hare and Green, *et al.*, titled, "Allogeneic Mesenchymal Stem Cells Ameliorate Aging Frailty: A Phase II Randomized, Double-Blind, Placebo-Controlled Clinical Trial" (the "Phase II Study"). Although the Phase II Study found statistically significant outcomes for patients in one of the treatment cohorts when compared to the placebo cohort, the study was limited by a small sample size of 10 patients per group for a total of 30 patients. As the Phase II Study authors noted, another study would be required with "30 patients per group for appropriate statistical power to detect a difference between groups." In short, the small sample size of the Phase II Study rendered the results unreliable, and Longeveron would need to conduct further studies with larger sample sizes

to reliably measure Lomecel-B's efficacy in treating Aging Frailty. Therefore, Defendants worked with the FDA to agree upon a design for larger scale trials.

48.     One of those larger trials was the Phase 2b trial, which Longeveron announced on September 7, 2017. Enrollment was completed in February 2020, and the last subject visit was expected in the first quarter of 2021. Defendants were scheduled to announce results of the trial in the third quarter of 2021. The Phase 2b Trial's primary efficacy endpoint was the six-minute walk test ("6MWT"), a cardiological test measuring the distance a person can walk in six minutes. Longeveron explained in its Registration Statement that it was adopting the 6MWT as an endpoint instead of long-term clinical outcomes such as "reduction in falls, fractures, hospitalizations, debilitations, and deaths" because measuring those clinical outcomes would require large, expensive, long trials. The FDA agreed to using the 6MWT, but only if they were included alongside other measures, such as patient reported outcomes ("PROs").

49.     Therefore, with consultation from the FDA, Longeveron adopted the 6MWT as a primary efficacy endpoint alongside, among other things, PROs as an additional endpoint for the Phase 2b Trial. However, by the time Longeveron went public, Defendants had data to show that the PRO results were not likely to be positive.

50.     Longeveron has been conducting an open-label Registry Trial, an observational study to evaluate and collect data on Lomecel-B, in the Bahamas since 2017 (the "Bahamas Registry Trial"). Data from the Bahamas Registry Trial measured the safety profile and possible efficacy of Lomecel-B in treating Aging Frailty. Eligible subjects with Aging Frailty could receive Lomecel-B at their own expense. The participants were instructed to "follow up with their local physician at the specified time points" during a twelve-month period after receiving Lomecel-B. In gathering additional efficacy information, the Bahamas Registry Trial gathered data

"specifically with respect to physical function, the individual's global impressions of change, biomarkers, and other indication-specific measures." The Bahamas Registry Trial collected data on endpoints important to the Phase 2b Trial – namely, the patients' reported outcomes. The collected data contributed to Longeveron's "overall understanding of the safety profile of Lomecel-B" and provided "real-world evidence on possible efficacy." However, Defendants failed to report on any of the Bahamas Registry Trial Data, including in the Offering Documents. And as Plaintiff's confidential witness revealed, those results presented a problem for the prospects of Lomecel-B.

51.     CW1 was Director of Research, Interdisciplinary Stem Cell, at the University of Miami and worked with Longeveron from 2015 to June 2018 in a similar capacity. CW1 served in a high-level position at Longeveron, working there through CW1's employment at the University of Miami as Director of Research. In their position, CW1 reported directly to Defendant J. Hare. At the time CW1 came over to Longeveron, Longeveron did not have a research and development unit. CW1 brought over their ability to conduct clinical trials to Longeveron. CW1's responsibilities included designing and running the initial clinical trial for Lomecel-B, then known as LMSC; corresponding with the FDA regarding the Phase 2b Trial, including providing data to the FDA; and collecting and reporting the status of the Bahamas Registry Trial to Defendants J. Hare and Green. CW1 confirmed seeing positive results from the Phase 1 Trial. However, according to CW1, patients in the Bahamas Registry Trial provided updates to Longeveron. CW1 learned that these results were "so-so", which CW1 said was typical with any patient study. CW1 confirmed that this patient information was reported to Defendants J. Hare and Green.

52.     Despite the known results from the Bahamas Registry Trial, Defendants elected to forgo long-term clinical outcomes in measuring the efficacy of Lomecel-B in treating Aging

Frailty. Rather than conducting a large, expensive, long trial, Longeveron elected for a cheaper, shorter measure of efficacy, the 6MWT. Under FDA advisement, Defendants accepted PROs as an additional endpoint but did not disclose the already-known trends of unsatisfactory patient reported outcomes. Defendants misled investors by failing to disclose known negative trends in patient reports from the Bahamas Registry Trial relevant to the success of the Phase 2b Trial.

53.    Given the similarity between the patient reports in the Bahamas Registry Trial and the PROs in the Phase 2B trial, the typically unsatisfactory results from the Bahamas Registry Trial made it unlikely that the PROs in the Phase 2b Trial would yield a positive result, and therefore, made it unlikely that the Phase 2b Trial would be successful. Despite this, Defendants continually talked up the likelihood that the Phase 2b Trial would succeed.

**MATERIAL MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS**

54.    On or about February 12, 2021, Longeveron sold 2.66 million shares of its Class A common stock at $10.00 per share. The Offering Documents contained untrue statements of material fact and omitted to state other facts necessary to make the statements not misleading under the circumstances in which they were made. With respect to Lomecel-B and Aging Frailty, the Offering Documents stated:

> *Lomecel-B for the Potential Treatment of Aging Frailty*
>
> We are evaluating Lomecel-B as a therapy for Aging Frailty because the potential mechanisms of action may suitably address many of the features and underpinnings of this condition. Foremost, Lomecel-B has the potential to reduce inflammation associated with Aging Frailty, and to promote an anti-inflammatory state by releasing anti-inflammatory molecules, which can promote physiological restoration to a more normal state. ***As our early clinical data show, Lomecel-B may be able to improve aspects of physical functioning***, as well as immune function.
>
> *            *            *
>
> As the leader in this field, we believe we are ***well-positioned to advance our Aging Frailty program into pivotal Phase 3 trials***.

14

(Emphasis added.)

55.     The statements in paragraph 54 were false and/or misleading when made because:

(1) Defendants had access to unsatisfactory patient responses from the Bahamas Registry Trial; (2)

Defendants failed to disclose said unsatisfactory results from the Bahamas Registry Trials on

numerous occasions; (3) Defendants knew that the results from the Phase II Study were not

trustworthy due to its small sample size; (4) therefore, early clinical data did not show that

"Lomecel-B may be able to improve aspects of physical functioning"; and (5) there was a

substantial undisclosed risk that the Phase 2b Trials would fail and that Longeveron had no basis

for believing it was "well-positioned to advance our Aging Frailty program into pivotal Phase 3

trials".

56.     Defendants further failed to disclose this risk in its Offering Documents as required

by SEC Regulation S-K. Defendants failed to describe the known trend of Bahamas Registry Trial

patients reporting negatively, which was reasonably likely to, and did, have a material effect on

Longeveron's financial conditions or results of operations.

**SEC Regulation S-K Required Longeveron to Disclose Known Trends and
Uncertainties in The Registration Statement**

*Item 303 demands disclosure*

57.     SEC Regulation S-K required Defendants to describe, in the Registration Statement

as well as all SEC filings and investor communications during the Class Period, "any known trends

or uncertainties that have had or that the registrant reasonably expects will have a material

impact . . . on net sales or revenues or income from continuing operations." 17 C.F.R. §

229.303(a)(3)(ii) ("Item 303") (2017). "Disclosure is mandatory where there is a known trend or

uncertainty that is reasonably likely to have a material effect on the registrant's financial condition

or results of operations." SEC Release Nos. 33-8056; 34-45321; FR-61.

58.     The SEC has emphasized that the disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future." S.E.C. Release No. 6835, 1989 WL 1092885, at *3, *17. Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." See Comm'n Guidance Regarding Mgmt.'s Discussion and Analysis of Fin. Condition and Results of Operations, S.E.C. Release No. 8350, 2003 WL 22996757, at *11 (December 19, 2003).

59.     Regulation S-K provides that the discussion of known trends, uncertainties, and events should appear in the section of an issuer's registration statement reporting "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"). In a1989 Interpretive Release, the SEC described the purposes of MD&A:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future.

> *Management's Discussion & Analysis of Fin. Condition & Results of Operations; Certain Inv. Co. Disclosures*, Release No. 6835 (May 18, 1989) (the "1989 Interpretive Release") available at 1989 WL 1092885.

60.     Item 5(d) requires disclosure based on "currently known trends, events, and uncertainties that are reasonably expected to have material effects." *Id.* at *4.

61.     Item 303 demands disclosure of known trends unless management determines that

a material effect on financial condition or results of operations is not likely to appear. The 1989

Interpretive Release provides the following test to determine if disclosure under Item 303(a) is

required:

> Where a trend, demand, commitment, event or uncertainty is known,
> management must make two assessments:
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come
> to fruition? If management determines that it is not reasonably likely to occur,
> no disclosure is required. (2) If management cannot make that determination, it
> must evaluate objectively the consequences of the known trend, demand,
> commitment, event or uncertainty, on the assumption that it will come to fruition.
> Disclosure is then required unless management determines that a material effect
> on the registrant's financial condition or results is not reasonably likely to occur.
> 1989 Interpretive Release, 1989 WL 1092885, at *6

62.     Issuers must disclose regulatory actual or contemplated regulatory action, as shown

by an example provided by the 1989 Interpretive Release:

> Facts: A registrant has been correctly designated a PRP by the EPA with respect
> to cleanup of hazardous waste at three sites. No statutory defenses are available.
> The registrant is in the process of preliminary investigations of the sites to
> determine the nature of its potential liability and the amount of remedial costs
> necessary to clean up the sites. Other PRPs also have been designated, but the
> ability to obtain contribution is unclear, as is the extent of insurance coverage, if
> any. Management is unable to determine that a material effect on future financial
> condition or results of operations is not reasonably likely to occur.
>
> Based upon the facts of this hypothetical case, MD&A disclosure of the effects
> of the PRP status, quantified to the extent reasonably practicable, would be
> required. [Footnote omitted]. For MD&A purposes, aggregate potential cleanup
> costs must be considered in light of the joint and several liability to which a PRP
> is subject. Facts regarding whether insurance coverage may be contested, and
> whether and to what extent potential sources of contribution or indemnification
> constitute reliable sources of recovery may be factored into the determination of
> whether a material future effect is not reasonably likely to occur.
>
> *Id.* at *6.

63.     Issuers must disclose both (a) known trends and uncertainties and (b) any potential

material impact of known trends and uncertainties on their own operations even if the trends are a

matter of public knowledge. 1989 Interpretive Release, 1989 WL 1092885 at *6. *See also Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 721 (2d Cir. 2011).

64.     Longeveron has been running its Bahamas Registry Trial since at least 2017. Defendants had over 3 years of data collected. CW1 attests they informed Defendants J. Hare and Green concerning the negative results reported by patients in the Bahamas Registry Trial. Therefore, Defendants knew or were reckless in not knowing that patients did not respond favorably to Lomecel-B as a treatment for Aging Frailty. As a result, Defendants knew or were reckless in not knowing there was a material risk that Lomecel-B would not see favorable results from its Phase 2b Trials. Therefore, under Item 5(d), Longeveron was required to disclose the then-known results and trends from the Bahamas Registry Trial.

*Item 503 demands disclosure*

65.     Item 503 requires disclosure and discussion of, among other things, "the most significant factors that make the offering risky or speculative."

66.     In violation of Item 503, the Registration Statement omitted to disclose the tepid results from the Bahamas Registry Trial which, as discussed above, could have material adverse effects on Longeveron's business.

**POST-IPO MATERIALLY FALSE AND MISLEADING STATEMENTS**

67.     On March 30, 2021, Longeveron issued a press release providing a corporate update and reporting the Company's fourth quarter and full year 2020 financial results (the "4Q/FY20 Press Release"). In addition to other results, that press release provided certain business updates from the first quarter of the Company's fiscal year 2021, including that the Company had "[s]uccessfully completed [a] 150 subject Phase 2b clinical study of Lomecel-B infusion for Aging Frailty, with top-line trial results anticipated in the third quarter of 2021." Additionally, the

4Q/FY20 Press Release quoted Defendant Green, who stated, *inter alia*, that "[w]e are proud of the significant progress made throughout 2020 and into 2021, including our successful IPO in February, which has positioned Longeveron with a stronger balance sheet and the ability to continue to advance the diverse Lomecel-B pipeline of trials"; that "both of our US Aging Frailty Phase 2 trials will have top line efficacy data available in the 3rd quarter of 2021"; and that ***"[t]his will be very exciting year for Longeveron, with several clinical trial and clinical data-driven catalysts on the near horizon."*** (Emphasis added.)

68.     The statement that "[t]his will be very exciting year for Longeveron, with several clinical trial and clinical data-driven catalysts on the near horizon" was false and misleading because: (1) clinical data from the Phase II Study was unreliable due to its small sample size; (2) Defendants knew or were reckless in not knowing that the Phase 2b Trial would likely be unsuccessful as PROs from the Bahamas Registry Trial were unsatisfactory; and (3) as such, Longeveron had no basis for stating there would be "clinical trial and clinical data-driven catalysts on the near horizon."

69.     Also on March 30, 2021, Longeveron hosted a conference call with analysts and investors to discuss the Company's fourth quarter and full year 2020 results. On that call, Defendant Green stated, in pertinent part:

> ***To close, I want to summarize the near-term milestones that we believe will drive significant shareholder value, including full clinical trial results from four Phase 1 and 2 trials expected this year***, which include Phase 1 Alzheimer's disease, two Phase 2 Aging Frailty trials, and a Phase 1 HLHS trial. And the initiation of at least three Phase 2 trials for Alzheimer's disease, Aging Frailty and Hypoplastic Left Heart Syndrome. ***We are working aggressively to advance Lomecel-B through clinical trials in these various indications and we remain extremely encouraged by the outlook for the company***, I believe we are well positioned to execute on a corporate strategy, especially following our IPO.
>
> (Emphasis added.)

19

70.    The statements that "near-term milestones that we believe will drive significant shareholder value" include "full clinical trial results from four Phase 1 and 2 trials expected this year" and that "[w]e are working aggressively to advance Lomecel-B through clinical trials in these various indications and we remain extremely encouraged by the outlook for the company" were materially misleading because: (1) clinical data from the Phase II Study was unreliable due to its small sample size; (2) Defendants knew or were reckless in not knowing that the Phase 2b Trial would likely be unsuccessful as PROs from the Bahamas Registry Trial were unsatisfactory; and (3) as a result of the foregoing, Defendants had no basis for their bullish statements.

71.    That same day, Longeveron filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2020 (the "2020 10-K"). The 2020 10-K stated, in relevant part, the following regarding Lomecel-B's Phase 2b trials for Aging Frailty:

> We are evaluating Lomecel-B as a therapy for Aging Frailty because the potential mechanisms of action may suitably address many of the features and underpinnings of this condition. Foremost, Lomecel-B has the potential to reduce inflammation associated with Aging Frailty, and to promote an anti-inflammatory state by releasing anti-inflammatory molecules, which can promote physiological restoration to a more normal state. ***As our early clinical data show, Lomecel-B may be able to improve aspects of physical functioning***, as well as immune function.
>
> *       *       *
>
> As the leader in this field, ***we believe we are well-positioned to advance our Aging Frailty program into pivotal Phase 3 trials.***

(Emphasis added.)

72.    The statements in paragraph 71 were false and/or misleading when made because: (1) Defendants had access to unsatisfactory patient responses from the Bahamas Registry Trial; (2) Defendants failed to disclose said unsatisfactory results from the Bahamas Registry Trials on numerous occasions; (3) Defendants knew that the results from the Phase II Study were not

trustworthy due to its small sample size; (4) therefore, early clinical data did not show that "Lomecel-B may be able to improve aspects of physical functioning"; and (5) there was a substantial undisclosed risk that the Phase 2b Trials would fail and that Longeveron had no basis for believing it was "well-positioned to advance our Aging Frailty program into pivotal Phase 3 trials".

73.     On May 14, 2021, Longeveron issued a press release providing a corporate update and reporting the Company's first quarter 2021 financial results. Also on that day, Longeveron hosted a conference call with analysts and investors to discuss the Company's first quarter 2021 results (the "1Q21 Investor Call"). On that call, Defendant Green stated, in relevant part:

> The fact that there isn't a single drug approved or a therapeutic approved anywhere in the world for the indication of Aging Frailty, those two trials [including the Phase 2b Aging Frailty Trial] are events that we really look forward to, we've been working on aging frailty research for almost four years, now we have partners in the national institutes on aging. [. . .] So *I think everybody out there should be looking forward to the data and looking forward to see if there is a potential treatment on the horizon* that can prevent or reverse these sort of progressive degenerative and devastating syndromes like aging related frailties.
>
> *So it's the release of data and the transition to these new phases of development that for us are really the catalyst that we're looking forward to.*"

(Emphasis added.)

74.     The statements in paragraph 73 were false and/or misleading because: (1) Defendants had access to unsatisfactory patient responses from the Bahamas Registry Trial; (2) Defendants failed to disclose said unsatisfactory results from the Bahamas Registry Trials on numerous occasions; (3) Defendants knew that the results from the Phase II Study were not trustworthy due to its small sample size; and (4) therefore, Green painted an overly optimistic picture, not grounded in facts known to him, of the likelihood of the Phase 2b Trial's success.

21

75.     Defendant J. Hare also made positive statements regarding Longeveron's clinical programs on the 1Q21 Investor Call, while indicating that Lomecel-B's clinical data would eventually support the drug's approval. Specifically, Defendant J. Hare stated, in relevant part:

> "I would completely agree that ***we face a very exciting upcoming two quarters, where we'll be releasing a substantial amounts [sic] of new clinical information and disseminating that information at important venues*** [. . .]. So the timing is very fortunate in that we have a large amount of data being released in a short amount of time, that together will . . . ***allow us to optimize the development strategies that we'll be using to take this product from where it is now through to approval in major venues like the United States*** and/or Japan."

(Emphasis added.)

76.     The statements in paragraph 75 were false and/or misleading because: (1) Defendants had access to unsatisfactory patient responses from the Bahamas Registry Trial; (2) Defendants failed to disclose said unsatisfactory results from the Bahamas Registry Trials on numerous occasions; (3) Defendants knew that the results from the Phase II Study were not trustworthy due to its small sample size; and (4) therefore, J. Hare portrayed the likelihood of Lomecel-B's success in an overly optimistic manner, especially in light of the negative Bahamas Registry Trials patient reports.

### **THE TRUTH IS REVEALED CAUSING PLAINTIFF'S LOSSES**

77.     On August 13, 2021, Longeveron issued two press releases—one announcing topline results of the Phase 2b Aging Frailty Trial, and a second providing a corporate update and reporting the Company's financial results for the second quarter of 2021. Both press releases disclosed, among other results, that "the four Lomecel-B cohorts did not show a statistically significant placebo-adjusted difference" and that "in the patient reported outcome questionnaire PROMIS—Physical Function—Short Form 20a (SF-20a) total score [. . .] Lomecel-B cohorts did not show a statistically significant difference compared to the placebo cohort[.]"

78.     In explaining this result, those press releases further disclosed the following:

"Primary analysis of the primary efficacy endpoint: The primary analysis compared the change from baseline in 6MWT distance for the four Lomecel-B cohorts to the placebo cohort at Day 180. [. . .] [A]fter adjusting for multiple comparisons using the Hochberg method (1988), *the four Lomecel-B cohorts did not show a statistically significant placebo-adjusted difference*[.]

\*     \*     \*

*The study's key secondary endpoints were day 180 change in the patient reported outcome questionnaire PROMIS--Physical Function--Short Form 20a (SF-20a) total score* and day 180 change in serum levels of tumor necrosis factor alpha (TNF-a), an inflammatory cytokine. *Lomecel-B cohorts did not show a statistically significant difference compared to the placebo cohort in the SF-20a score*, and the TNF-a analysis is pending. *The remainder of the efficacy endpoints*, which included assessments of physical function, sexual function, fear and risk of falling, depression, cognition, frailty status, pulmonary function, and clinical outcomes, were considered exploratory and *Lomecel-B-treated groups did not show significant differences versus placebo at most of the time points for any of the endpoints.*"

(Emphasis added.)

79.     As Defendants knew, or were reckless in not knowing, for at least three years, patients treated with Lomecel-B did not provide positive feedback in the Bahamas Registry Trial. The FDA had explicitly stated the 6MWT could be an acceptable primary efficacy endpoint "if included with a validated PRO and a suitable biomarker[.]" Longeveron adopted the FDA's suggestions in designing the Phase 2b Trial.

80.     Despite years of data to the contrary, Defendants continued to mislead investors in its Offering Documents and throughout the Class Period, stating that Longeveron was "well-positioned to advance our Aging Frailty program into pivotal Phase 3 trials." Defendants knew, or were reckless in not knowing, to the contrary.

81.     On this news, Longeveron's stock price fell $1.51 per share, or 27.91%, to close at $3.90 per share on August 13, 2021, representing a total decline of 61% from the Offering price.

82.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Longeveron's securities, Plaintiff and other Class members have suffered significant losses and damages.

## ADDITIONAL ALLEGATIONS SUPPORTING SCIENTER

### Additional Allegations Concerning J. Hare's Scienter

83.     J. Hare's scienter can be inferred from the small size of the Company. As of April 14, 2022, Longeveron had approximately 18 employees. Due to the small size of the Company, J. Hare was aware of Lomecel-B's trial results and the unsatisfactory patient reports from the Bahamas Registry Trial.

84.     J. Hare's scienter can also be inferred from the fact that Lomecel-B was the Company's only product candidate undergoing trials and the Bahamas Registry Trial represented a significant portion of the Company's total revenue. For the fiscal year ended December 31, 2020, the fees collected from the Bahamas registry trial accounted for 23% of the Company's total revenue.

85.     J. Hare's scienter can be further inferred from his role as a co-founder of Longeveron, Chairman of the Board, and Chief Science Officer. Numerous CW accounts corroborate J. Hare's extensive involvement in Lomecel-B trials. CW1 attests they attended meetings with J. Hare where they discussed various aspects of the trials. CW1 also attests they reported directly to J. Hare and apprised J. Hare of the results from the Bahamas Registry Trial. Other CWs confirm Hare's knowledge.

86.     CW2 is a former Chief Operating Officer for Longeveron from December 2014 to December 2019. CW2 had close interactions with J. Hare during their time at Longeveron and

reported directly to J. Hare. CW2 attests that J. Hare was responsible for designing the studies and was deeply involved in every process.

87.    CW3 was a Senior Scientist at Longeveron from May 2017 to May 2018. CW3 worked on Lomecel-B trials as a scientist. CW3 also attests that J. Hare was heavily involved in all trials. Further, CW3 attests J. Hare was the Principal Investigator on all trials and that "all trials came from [J.] Hare."

## Additional Allegations Concerning Green's Scienter

88.    Green's scienter can be inferred from the small size of the Company. As of April 14, 2022, Longeveron had approximately 18 employees. Due to the small size of the Company, Green was aware of Lomecel-B's trial results and the unsatisfactory patient reports from the Bahamas Registry Trial.

89.    Green's scienter can also be inferred from the fact that Lomecel-B was the Company's only product candidate undergoing trials and the Bahamas Registry Trial represented a significant portion of the Company's total revenue. For the fiscal year ended December 31, 2020, the fees collected from the Bahamas registry trial accounted for 23% of the Company's total revenue.

90.    Green's role as the Chief Executive Officer of Longeveron supports a strong inference of scienter. By virtue of his role as the CEO of Longeveron, Green was deeply involved in the Lomecel-B testing process. CW1 attests they attended meetings with Green, where they discussed various aspects of the trials. CW1 further attests Green would look at trial data and that CW1 would help Green understand clinical trials, how to write protocols, and study designs.

91.    Likewise, CW2 attests that Green was heavily involved in the day-to-day of Lomecel-B trials. CW2 attests they attended meetings with Green where other Longeveron

employees would provide updates. Furthermore, CW2 attests that Green told CW2 he did not believe Lomecel-B was going to work. CW2 further attests that CW2 attended regular meetings where Green would present data to the Data and Safety Monitoring Board.

### Additional Allegations Concerning Clavijo's Scienter

92.     Clavijo's scienter can be inferred from the small size of the Company. As of April 14, 2022, Longeveron had approximately 18 employees. Due to the small size of the Company, Clavijo was aware of Lomecel-B's trial results and the unsatisfactory patient reports from the Bahamas Registry Trial.

93.     Clavijo's scienter can also be inferred from the fact that Lomecel-B was the Company's only product candidate undergoing trials and the Bahamas Registry Trial represented a significant portion of the Company's total revenue. For the fiscal year ended December 31, 2020, the fees collected from the Bahamas registry trial accounted for 23% of the Company's total revenue.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

94.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all persons or entities that purchased or otherwise acquired Longeveron securities pursuant and/or traceable to the Registration Statement issued in connection with Longeveron's February 12, 2021 IPO and during the Class Period.

95.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Longeveron or its transfer agent and may be notified of the pendency

of this action by mail, using the form of notice similar to that customarily used in securities class actions.

96.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

97.     Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

98.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a)      whether Defendants violated the federal securities laws;

b)      whether the Registration Statement omitted and/or misrepresented material facts about the Company's business, operations, and prospects; and

c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

99.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**Applicability of Presumption of Reliance:**
*Affiliated Ute*

100.    The statements made by Longeveron and the Exchange Act Individual Defendants during the Class Period were misleading for omitting to disclose information concerning the on-going investigation which rendered statements in the Offering Documents misleading.

101.    Neither plaintiffs nor the Class  need prove reliance – either individually or as a class – because under the circumstances of this case, which primarily are based on omissions of material fact as described above, positive proof of reliance is not a prerequisite to recovery, pursuant to the ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1972). All that is necessary is that the facts that Longeveron withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

**Application of Presumption of Reliance:**
**Fraud on the Market**

102.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) Longeveron and the Exchange Act Individual Defendants made public statements that were rendered misleading because they failed to disclose material facts necessary to prevent such statement from being misleading during the Class Period; (b) the omissions were material; (c) Longeveron securities were traded in efficient markets during the Class Period.

103.    Longeveron's securities traded in efficient markets during the Class Period for the following reasons: (i) the securities were traded on NASDAQ; (ii) on average shares representing more than 115% of the securities' float were traded weekly during the Class Period; (iii) Longeveron timely filed all required annual, quarterly and material event reports with the SEC during the Class Period; (iv) Longeveron regularly communicated with public investors via

established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; (v) the price of Longeveron securities responded quickly to incorporate and reflect new public information concerning Longeveron during the Class Period; (vi) currently, 41 market makers currently make a market in Longeveron securities.

104.    During the Class Period, Longeveron and Exchange Act Individual Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Longeveron securities; and (iii) cause Plaintiff and other members of the Class to purchase Longeveron securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Longeveron and Exchange Act Individual Defendants, and each of them, took the actions set forth herein.

105.    Pursuant to the above plan, scheme, conspiracy and course of conduct, Longeveron and each of the Exchange Act Individual Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts

and the media that were designed to influence the market for Longeveron securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Longeveron's finances and business prospects.

106.    By virtue of their positions at Longeveron, Longeveron and Exchange Act Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Longeveron and Exchange Act Individual Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Longeveron and Exchange Act Individual Defendants. Said acts and omissions of Longeveron and Exchange Act Individual Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

107.    Information showing that Longeveron and Exchange Act Individual Defendants acted knowingly or with reckless disregard or the truth is peculiarly within the knowledge and control of Longeveron and Exchange Act Individual Defendants. As the senior managers and/or directors of Longeveron, the Exchange Act Individual Defendants had knowledge of the details of Longeveron internal affairs.

108.    The Exchange Act Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Exchange Act Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Longeveron. As officers and/or directors of a publicly-held company, the Exchange

Act Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Longeveron's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market prices of Longeveron securities were artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Longeveron's business and financial condition which were concealed by Longeveron and Exchange Act Individual Defendants, Plaintiff and the other members of the Class purchased Longeveron securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Longeveron and Exchange Act Individual Defendants, and were damaged thereby.

109.    During the Class Period, Longeveron securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased Longeveron securities at prices artificially inflated by the wrongful conduct of Longeveron and Exchange Act Individual Defendants. Had Plaintiff and the other members of the Class known the truth, they would not have purchased said securities, or would not have purchased them at the inflated prices that were paid. At the time of the purchases by Plaintiff and the Class, the true value of Longeveron securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Longeveron securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

110.     By reason of the conduct alleged herein, Longeveron and Exchange Act Individual Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

111.     As a direct and proximate result of the wrongful conduct of Longeveron and Exchange Act Individual Defendants, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

112.     This action was timely filed within two years of discovery of the misleading statements and within five years of the dates of purchase of the subject securities.

## COUNT I
### Violations of Section 11 of the Securities Act
### Against All Defendants

113.     Plaintiff repeats and re-alleges the allegations set forth in ¶¶ 1-66, 94-99 as if fully set forth herein.  Plaintiff further disclaims any allegation of fraud, recklessness or intentional misconduct.

114.     This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants except Longeveron.

115.     The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

116.     The Defendants named in this Count were responsible for the contents and dissemination of the Registration Statement; signed the Registration Statement; and/or were directors, underwriters or selling stockholders who are appropriate defendants in this Count.

117.     Defendants are strictly liable to Plaintiff and the Class for the misstatements and omissions in the Registration Statement.

118.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

119.     The Underwriters owed to the holders of the securities acquired through the Registration Statement the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

120.     Plaintiff acquired Longeveron securities pursuant to the Registration Statement.

121.     At the time of his purchases of Longeveron securities, Plaintiff and members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

122.     This claim is brought within one year after discovery of the untrue statements and/or omissions in the Registration Statement that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement. It is therefore timely.

**COUNT II**
**Violations of Section 15 of the Securities Act**
**Against the Individual Defendants**

123.     Plaintiff repeats and re-alleges the allegations set forth in ¶¶ 1-66, 94-99, 113-122, as if fully set forth herein.  Plaintiff further disclaim any allegation of fraud, recklessness or intentional misconduct.

124.    This cause of action is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o against the Individual Defendants and Longeveron, each of whom was a control person of Longeveron during the relevant period.

125.    The Individual Defendants and Longeveron were in positions to control and did control, the false and misleading statements and omissions contained in the Registration Statement.

126.    None of the Individual Defendants and Longeveron made reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

127.    Plaintiff and the Class have sustained damages.  The value of Longeveron securities has declined substantially due to the Securities Act violations alleged herein.

128.    This claim is brought within one year after discovery of the untrue statements and/or omissions in the Registration Statement that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement. It is therefore timely.

### COUNT III
### For Violations of §10(b) of the Exchange Act and Rule 10b-5
### Against Longeveron and Exchange Act Individual Defendants

129.    Plaintiff repeats and re-alleges the allegations set forth in ¶¶ 1-112, as if fully set forth herein. This Count is asserted against Longeveron and Exchange Act Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule l0b-5 promulgated thereunder by the SEC.

130.    Longeveron is liable for the acts of the Exchange Act Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all

of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

131.    The scienter of the Exchange Act Individual Defendants and other employees and agents of the Company is similarly imputed to Longeveron under *respondeat superior* and agency principles.

**COUNT IV**
**For Violations of §20(a) of the Exchange Act**
**Against Exchange Act Individual Defendants**

132.    Plaintiff repeats and re-alleges the allegations set forth in ¶¶ 1-112, 129-131, as if fully set forth herein.

133.    During the Class Period, the Exchange Act Individual Defendants and Longeveron participated in the operation and management of Longeveron, and conducted and participated, directly and indirectly, in the conduct of Longeveron's business affairs. Because of their senior and controlling positions, they knew the adverse non-public information about Longeveron, and the regulatory risks and issues raised by the SAIC.

134.    As officers and/or directors of a publicly owned company, the Exchange Act Individual Defendants had a duty to disseminate accurate and truthful information with respect to Longeveron's financial condition and results of operations, and to correct promptly any public statements issued by Longeveron which had become materially false or misleading.

135.    Because of their positions of control and authority as senior officers and/or controlling shareholders, the Exchange Act Individual Defendants and Longeveron were able to, and did, control the contents of the various reports, press releases and public filings which Longeveron disseminated in the marketplace during the Class Period concerning Longeveron's results of operations. Throughout the Class Period, the Exchange Act Individual Defendants and

Longeveron exercised their power and authority to cause Longeveron to engage in the wrongful acts complained of herein. The Exchange Act Individual Defendants and Longeveron therefore, were "controlling persons" of Longeveron within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Longeveron securities.

136.    Each of the Exchange Act Individual Defendants and Longeveron, therefore, acted as a controlling person of Longeveron. By reason of their senior management positions, being directors, and/or controlling shareholders of Longeveron, each of the Exchange Act Individual Defendants and Longeveron had the power to direct the actions of, and exercised the same to cause, Longeveron to engage in the unlawful acts and conduct complained of herein. Each of the Exchange Act Individual Defendants and Longeveron exercised control over the general operations of Longeveron and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

137.    By reason of the above conduct, the Exchange Act Individual Defendants and Longeveron are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Longeveron.

138.    This action was timely filed within two years of discovery of the misleading statements and within five years of the dates of purchase of the subject securities.

### PRAYER FOR RELIEF

A.    Determining that the instant action may be considered a class action under Rule 23 or the Federal Rules of Civil Procedure, and certifying Plaintiff as Class representative;

B.    Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post

judgment interest; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: April 26, 2022                                        **THE ROSEN LAW FIRM P.A.**

                                                  /s/ Laurence Rosen
                                                  Jonathan Stern (*pro hac vice*)
                                                  Laurence Rosen
                                                  Ha Sung (Scott) Kim (*pro hac vice*)
                                                  275 Madison Avenue, 40th Floor
                                                  New York, NY 10016
                                                  Telephone: (212) 686-1060
                                                  Facsimile: (212) 202-3827
                                                  jstern@rosenlegal.com
                                                  lrosen@rosenlegal.com
                                                  skim@rosenlegal.com

                                                  *Lead Counsel for Plaintiff and the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 26th day of April, 2022, a true and correct copy of the foregoing AMENDED CLASS ACTION COMPLAINT was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/ Laurence Rosen
Laurence Rosen